**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
COURTNEY ROBB,                                          :
                                                        :        Index No.:
                                      Plaintiff,        :
                     v.                                 :
                                                        :        **COMPLAINT**
ADVENT CAPITAL MANAGEMENT, LLC and                      :
TRACY MAITLAND, in his personal and                     :
professional capacities,                                :        **Jury Trial Demanded**
                                                        :
                                      Defendants.       :
----------------------------------------------------------------X

Plaintiff Courtney Robb hereby alleges through her counsel Wigdor LLP, as against

Defendants Advent Capital Management, LLC ("Advent") and Tracy Maitland ("Maitland")

(together "Defendants") as follows:

## SUMMARY OF CLAIMS

1.      Advent is a global hedge fund with offices in New York City.  Tracy Maitland is

the founder and CEO of Advent, a firm that boasts of a management portfolio worth over $9

billion in investments.[1]  In August 2016, Ms. Robb started as a junior investment associate, one

of the few female employees on Advent's trading floor. The relentless, egregious discrimination

that Ms. Robb experienced at Advent is abhorrent.

**A.      Advent's Male Portfolio Managers and Traders Rank Women in 3 Groups:**
         **"Fuck, Marry or Kill"**

2.      Portfolio managers and traders at Advent, all men that Ms. Robb was junior to,

openly and brazenly classified women into the following three categories:

         **(1) "Fuck"**
         **(2) "Marry" or**
         **(3) "Kill"**

---

[1]      https://www.adventcap.com/news/advent-capital-management-marks-20-years/

3.      Horrifically, on Advent's trading floor in the presence of female employees including Ms. Robb, men discussed and assigned such deplorable and hideous labels.

4.      Some of these same men used the disgusting categories specifically in reference to Ms. Robb and other female employees. In fact, a male trader admitted to Ms. Robb that in connection with **"fuck, marry or kill"** discussions about her, some men at Advent thought that Ms. Robb's ranking should change from **"marry"** status to **"kill"** status.

5.      Incredibly, portfolio manager Mike Brown ("Brown"), who reported to Maitland, allegedly told other men at Advent that Ms. Robb was such an <u>uptight bitch</u> that she already was at "wife" status.

**B.      Men Rate Chelsea Clinton a "3" out of a "10"**

6.      When Ms. Robb started at Advent in 2016, the firm was located in the same building as the NYC office of the Clinton Foundation.[2]  Advent employees would see Chelsea Clinton in the lobby and elevators.  Brown disgustingly and openly ranked Chelsea Clinton's physical attractiveness level on a scale of 1-10, in front of other employees on the trading floor, including Ms. Robb.  By way of example only, on November 22, 2016, having seen Chelsea Clinton, Brown loudly proclaimed to those on the trading floor:

**"On her best day, Chelsea Clinton is a 3."**

7.      Brown used the numeric ranking because in addition to the "fuck, marry and kill" classifications, men at Advent engaged in regular, ongoing ranking of women on a <u>scale of 1-10</u>.

8.      These instances were regular and ongoing such that all statements cannot be included in this pleading.

**C.      Women Were Referred to as "Cunts" and "Bitches"**

---

[2]      https://www.clintonfoundation.org/.   In 2016, Advent and the Clinton Foundation were located at 1271 Avenue of the Americas, New York, NY.

9.     Senior men at Advent regularly and casually used various vulgarities to refer to women.  Such vulgarities included the use of and constant iteration of words such as:

**"Cunt"** and
**"Bitch"**

10.     Ms. Robb reported to her supervisor Craig Altshuler ("Altshuler"), the repeated and casual use of such vulgarities by male employees and <u>managers.</u>  Nothing was done to remedy the use of such language at Advent.

**D.**     **<u>Ms. Robb is Fired After Complaining About the Harassment</u>**

11.     As set forth in detail below, after being disgraced and demeaned for months with no end in sight, Ms. Robb dared to speak out about the ongoing disgusting behavior.

12.     Advent had no human resources department.  Ms. Robb was forced to express her objections to her male supervisors and other senior leaders – all men.  The retaliation against her for daring to speak up was swift and severe.

13.     On March 27, 2017, the same day Ms. Robb engaged in protected speech about the hideous conduct to Chief Operating Officer ("COO") Kris Haber ("Haber"), Maitland summoned Ms. Robb to his office.   Cowardly, Advent's owner and CEO, closed his office door before he horrifically threatened Ms. Robb by saying:

**"I heard you think the company's management is <u>fucked up</u>."**

14.     It is abhorrent that the CEO of a firm that brags about managing $9 billion in investments would issue such a threat to a 31-year-old junior female employee in his office <u>behind a closed door</u>.  Maitland dismissed Ms. Robb's complaints about Brown's flagrant sexual harassment as "locker-room talk."   He threatened Ms. Robb not to make her concerns "into a bigger deal than [it] needed to be."

15.     Several days later, Ms. Robb was called into Haber's office to meet with him alone, behind a closed door.   Haber pressed Ms. Robb for more information and harshly questioned her about the alleged sexual harassment. Haber grilled Ms. Robb about whether she was aware of the following:

- Brown's alleged interest in photography;
- Brown's alleged interest in having photo shoots on his property or at his residence;
- Brown's alleged photo shoots with female models on Brown's property or at his residence;
- Brown's alleged naked photo shoots on Brown's property or at his residence; and
- Brown's alleged photography of naked women.

16.     Haber wanted to know if Ms. Robb had seen photos from such alleged photo shoots.

17.     In May 2017, just weeks after engaging in protected speech about discrimination to Maitland himself and the COO, Advent fired Ms. Robb without any explanation. In the blink of an eye, Ms. Robb went from being an excellent employee to suddenly and inexplicably a person deserving of termination because she was a "poor fit."

18.     The decision to fire Ms. Robb was a blatant act of retaliation.  Worse, it was a message to female employees that Advent and Maitland are more interested in protecting their own financial interests than remedying sexual harassment or gender discrimination and that anyone who dares to stand against Advent's unlawful conduct will be harshly punished.

19.     As if Advent's decision to double-down on its non-compliance with anti-discrimination laws by terminating Ms. Robb was not enough, Advent and Maitland took their vengeful retaliation to disgusting, horrific levels.

**E.     After Ms. Robb Files a Discrimination Charge, Advent Maliciously Sues Ms. Robb -
Falsely Accusing her of Theft**

20.     Just weeks after Ms. Robb submitted a complaint of discrimination and retaliation
to the NYC Commission (the "Commission") about her unlawful termination, Advent sent Ms.
Robb's then-lawyer a despicable, threatening letter that in essence urged Ms. Robb to drop her
protected legal claims or "else" Advent would accuse her of "civil theft."  This blatant retaliation
is unlawful and malicious.

21.     On December 15, 2017, after Ms. Robb refused to cower to Advent and
Maitland's punitive threats, Advent commenced a lawsuit in New York Supreme Court, *Advent
Capital v. Courtney Robb,* Index No. 657402/2017 (the "NYS Action"), that falsely and
frivolously accused Ms. Robb of alleged misdeeds concerning work-related emails that at all
times were in the possession of Advent.

22.     Included among the false and defamatory accusations regarding work emails in
the publicly filed complaint are the following:

- Ms. Robb engaged in "illegal, unauthorized and otherwise wrongful
  misappropriate and theft of confidential information;"
- Ms. Robb "stole key documents from the company;"
- Ms. Robb "harmed Advent's business to benefit herself and Advent's
  competitors;" and
- Ms. Robb is liable for "misappropriation of trade secrets, breach of
  fiduciary duty and loyalty and conversion and civil theft."

23.     The NYS Action is meritless.

24.     Advent engaged in such horrific retaliatory treatment of Ms. Robb to inflict
severe harm, as well as to silence her and other female employees from speaking out. Such abuse
of the legal process is the reason why punitive damages exist and why such extreme penalties are
requested in this Complaint against Advent and Maitland.

25.     The NYS Action filed against Ms. Robb was orchestrated with the hope that Ms. Robb would feel threatened and intimidated to such an extreme level that she would drop her claims against Advent and Maitland in the Commission.   Refusing to be victimized again, Ms. Robb continued to assert her claims before the Commission.

26.     Thereafter, for the **next 3 years**, Advent and Maitland used the NYS Action to subject Ms. Robb to relentless, unimaginable persecution.

27.      Advent and Maitland retained a behemoth law firm that claims it has "more than 1,300 attorneys, consultants and professionals in 22 locations across the U.S., U.K. and China …. and projected gross revenue of nearly $1 billion," to aggressively litigate the NYS Action against Ms. Robb.

28.     Knowing that Ms. Robb was forced to pay for her legal defense in the NYS Action on an hourly basis, Advent cruelly instructed its high priced lawyers to file multiple motions and to otherwise create endless conflict to cause Ms. Robb further financial harm.

29.     Because of Advent's contumacious conduct in the NYS Action, by early 2020, Ms. Robb had paid legal fees in excess of what Advent paid to her in 2016.[3]

30.     The attack against Ms. Robb is ongoing. Just weeks before the NYS civil court system went on pause due to the COVID-19 pandemic, Advent and Maitland continued to bully, harass and over-power Ms. Robb and her counsel by filing a motion to amend the original complaint, *see* NYS Action, Index No. 657402/2017, Docket No. 28.

31.     After recent notification from the Commission of her right to proceed in our court system, Ms. Robb commences this action to shine light on the inexorable harassment and

---

[3]     Previously, Ms. Robb was represented by an attorney that operates a solo practice.  On or about March 13, 2020, after Ms. Robb retained Wigdor LLP, the undersigned substituted as counsel for Ms. Robb in the NYS Action.

intimidation inflicted on her by her Advent and Maitland for the last 3 years because she dared to speak up about the unlawful sexual harassment at Advent, and then dared to speak up about her retaliatory termination.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, as Plaintiff has asserted claims that arise under federal laws of the United States. In particular, Plaintiff has asserted claims under Title VII, 42 U.S.C. §2000(e), *et seq*., and the Equal Pay Act, 29 U.S.C. §206(d).

33.     This Court has supplemental subject matter jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

35.     Plaintiff Courtney Robb was an employee at Advent Capital Management, LLC and worked in Advent's New York City office. At all relevant times, Ms. Robb met the definition of an "employee" under all applicable statutes.

36.     Defendant Advent Capital Management, LLC is a New York registered limited liability company, organized under Delaware law with its principal place of business located at 888 Seventh Avenue, 31st Floor, New York, NY 10019.  At all relevant times, Advent Capital Management, LLC met the definition of an "employer" of Plaintiff under all applicable statutes.

37.     Defendant Tracy Maitland is the Founder, President and Chief Investment Officer of Advent Capital Management, LLC.  Maitland supervised Ms. Robb and had authority over the terms and conditions of her employment.  At all relevant times, Maitland met the definition of "employer" under all relevant statutes.

## PROCEDURAL BACKGROUND

38.     After Advent unlawfully fired Ms. Robb in May 2017, she submitted a charge (the "Charge") of discrimination and retaliation against Defendants to the New York City Commission on Human Rights (the "Commission) (No.: M-E-OS-18-27801).   The Charge was dual filed with the Equal Employment Opportunity Commission ("EEOC") (Federal Charge No.: 16F-2018-00013C).

39.     Pursuant to Section 8-113(a), N.Y.C. Admin. Code, Title 8, Chapter 1, Ms. Robb's charge was administratively discharged on March 16, 2020.

## FACTUAL ALLEGATIONS

### I.     Advent Capital

40.     Formed more than 20 years ago by Maitland, Advent boasts a management portfolio worth over $9 billion in investments.[4]  On its own website and across global media outlets, Advent widely markets the funds allegedly on its client roster.[5]

---

[4]       https://www.adventcap.com/news/advent-capital-management-marks-20-years/
[5]       *Id*.; According to a March 31, 2020 published Entity Report, Advent and several executives, including Maitland, are disclosed as entities "doing business" with NYC Mayor's Office of Contract Services, as pension related businesses.  See, https://www1.nyc.gov/assets/mocs/downloads/pdf/DBDB_Reports/rpt_DBDB_Entity_Report.pdf, at page 62.

41.     Maitland operates Advent with an exclusively male leadership team.  As recently as May 2020, Advent's website depicted a list of the "senior leadership" positions that reveal that it is exclusively male.

42.     During Ms. Robb's employment, in addition to the all-male executive team, the department and group managers exclusively were male.  As such, at all relevant times, the decision-making authority at Advent was in the hands of men.

43.     Such a gross absence of women from senior management effectively proves discrimination on its face without the need for statistical or other evidence.  In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977), the Supreme Court held that there was no way to explain away a complete lack of women in leadership: "[T]he company's inability to rebut the inference of discrimination came not from a misuse of statistics but from the '**inexorable zero**.'"

44.     Advent cannot explain away the disparity that is inherent in the fact that it is run exclusively by men.

45.     It is within the context of this male-centric leadership that the rampant gender based discrimination at Advent against women, including Ms. Robb, was allowed to develop and flourish.

## II.     **Ms. Robb's Employment at Advent Capital**

46.     In August 2016, Ms. Robb joined Advent as an investment associate in its Client Advisory Group ("CAG"), under Altshuler's supervision. Ms. Robb's job was to help maintain and develop relationships with existing clients and assist in selling Advent's investment strategies to other potential clients.

47.     Ms. Robb worked on the trading floor at Advent, in and among traders and portfolio managers.

48.     Ms. Robb's desk was part of a large table shared by seven people.  The table was located in the middle of the trading floor – an open-plan space, internally referred to as the "Fishbowl." Ms. Robb's workspace was approximately 2.5 feet wide and she was within clear earshot of every person who sat on the floor.  When seated at her desk, Ms. Robb's knees would frequently hit those of her neighboring colleagues.

49.     When Ms. Robb was hired, Altshuler told her that it would take her at least 18 months for her to get up to speed and become entirely competent in her role.  He said this was the typical timeline and expectation for all new associates.

50.     In October 2016, after Ms. Robb had been at Advent for just two months, Ms. Robb's workload was increased to include responsibilities for reporting on an extra $2.5 billion worth of assets.  Ms. Robb had, in effect, taken over the duties of an associate vice president, Ellen Dunleavy, while Ms. Dunleavy on maternity leave.

51.     In or around November 2016, rather than purchasing a laptop for Ms. Robb to use for work, Altshuler told Ms. Robb that she needed to bring her personal laptop into the office in order for the Information Technology ("IT") team to install software onto Ms. Robb's personal laptop.   Ms. Robb was told this was necessary because she was expected to work from home, remotely, outside of regular office hours. Other Advent employees and senior leadership also used their laptops to work remotely.

52.     In December 2016, after working at Advent for less than six months, Ms. Robb received a raise and a bonus worth 27% of her starting salary.

III.     **Male-Centric Workplace at Advent**

53.     At the time Ms. Robb was employed, the investment employees reporting to Maitland, in his role as Chief Investment Officer, consisted of three male traders (no female traders), seven male portfolio managers ("PMs") (no female PMs), four male research analysts (no female research analysts), and one male economist.   As compared to these 15 male investment employees, just one female, a trading "assistant," was employed at Advent as part of the investment team reporting to Maitland.

54.     Additionally, in the risk, business development and sales departments – not one female employee was employed.  Advent and Maitland staffed these teams exclusively by men.

55.     In contrast, the team that Ms. Robb worked on, the Client Advisory Group ("CAG"), often labeled "Investor Relations" at other firms, was staffed exclusively by female employees except for, of course, the two male "directors" of the team, Craig Altshuler and Michael Kane ("Kane").

56.     The four to six female employees in this client-facing role all held the title of "associate." They reported only to men.  Several months before Ms. Robb was fired, Advent hired Maxim Rabinovich ("Rabinovich"), who was approximately seven years younger than Ms. Robb, having graduated college in 2013.  Rabinovich was the sole male associate in this group.

57.     All of Maitland's executives, including the controller, head of operations and general counsel, were men.  Not one female was part of this senior management team.

58.     The office manager was a male employee.  There was no department labeled as human resources.

59.     The entire IT department was male.

60.     In sum, outside of administrative assistants (all females), the one trading assistant and Ms. Robb and the female associates in CAG, the only other female employee in Advent's NYC office was a bookkeeper.

## IV.     Ms. Robb is Subjected to Sexual Harassment and Discrimination at Advent

61.     Within days of starting at Advent, Ms. Robb realized that Advent's senior leadership fostered a sexually charged and misogynistic work environment.

62.     By way of example only, on or around August 22, 2016, Brown, who sat a few feet away from Ms. Robb, casually declared – loud enough for all in the Fishbowl to hear – that "**watching women get out of cabs should be a spectator sport**."

63.     Brown frequently worked within Advent's High-Yield Strategy team – a team internally known for "rainmaking."

64.     Less than a month later, on or around September 12, 2016, Brown humiliatingly asked Ms. Robb if she had had a "**wild weekend**," commenting that Ms. Robb "**looked like a party girl**."

65.     No woman should be subjected to such a degrading and mortifying comment regarding her appearance, much less while attempting to work in a supposed professional environment.  Unfortunately, these remarks were only the tip of the iceberg when it came to Brown's sexist language and general disregard for professional work standards.

66.     On or around October 10, 2016, within earshot of the entire trading floor, Brown nonchalantly declared that he:

> "**Hate[s] the fall when women stop wearing those short little skirts**."

67.     Brown further stated that he:

**"Should have been a cheerleader in college, so that [he] could have spent [his] time looking up girls' skirts**."

68.     On or around November 9, 2016, Brown physically cornered Ms. Robb in the office kitchen.  He asked if she "**want[ed] a kiss**."  Brown placed his hand on Ms. Robb's shoulder and reached behind her back for a Hershey's Chocolate Kiss – which was, unbeknownst to Ms. Robb, sitting in a bowl on the table behind her.

69.     As Ms. Robb stood there, visibly and understandably shaken and speechless, Brown **touched her lower back, squeezed her** and said, "**lighten up.  I'm kidding**."

70.     Advent expected Ms. Robb not to complain about such traumatizing incidents.

71.     On or around November 22, 2016, Brown openly ranked Chelsea Clinton's physical attractiveness on a scale of 1-10.  He did so in front of other employees on the trading floor, including Ms. Robb.  Having seen Chelsea Clinton that morning, Brown loudly proclaimed, "**on her best day, Chelsea Clinton is a three**."

72.     Brown's "ranking" of Ms. Clinton was not out of the ordinary; the men on the trading floor regularly held discussions and debates regarding various women's "rankings."[6]

73.     Unsurprisingly, many of the women who were subject to these hotly contested "ranking" debates were Advent employees who were sitting within earshot of the trading floor.

74.     Brown's degradation of women was constant.  By way of example only, Brown only referred to female employees as "girls."  For instance, in the morning, Brown would walk into the office and say "**hi girls,**" and when leaving, remark, "goodnight girls."

---

[6]     By way of example only, on January 10, 2017, the male portfolio managers held a long, open discussion on the trading floor, ranking women's appearances.  Brown was heard saying, "she's a 7 in most places, a 6 in New York," referring to an unknown woman.

75.    Brown's tone and inflection when saying "girls" greatly offended Advent's female employees.  Brown used the reference openly in front of senior executives including, but not limited to, Michael Kane ("Kane"), a director in the CAG with a junior associate reporting to him, Altshuler and Ms. Dunleavy.

76.    In response to complaints by Ms. Robb and another female associate, Kristin Kunert, Altshuler and Ms. Dunleavy dismissed Brown's behavior as "harmless" and justified Brown's inappropriate conduct by likening him to an "inappropriate, crazy uncle."

77.    One evening in or around late November 2016, Brown bid the female employees his usual farewell of "night, girls!" before leaving the office.  In response, Ms. Kunert exclaimed, "excuse me, Mike.  I am thirty-four years old.  I pay for my own apartment on the Upper West Side.  I have an MBA from Cornell.  It's probably time that you stopped referring to me as a girl."  This exchange was witnessed by Ms. Robb, Kane and his female junior report, Yulia Kosiw.

78.    Then, on December 20, 2016, in front of the entire trading floor, Brown horrifyingly referred to Ms. Robb as an "**idiot with zero reading comprehension skills**."

**V.    Ms. Robb Complains Directly to Brown**

79.    In response to Brown's disparaging unlawful comment that she was an "**idiot with zero reading comprehension skills**," and because Advent completely failed to discipline Brown, Ms. Robb and Ms. Kunert complained directly to Brown about his behavior.

80.    Ms. Robb specifically objected to Brown's use of the word "girl" in reference to her and other female employees.  Brown's outrageous and unlawful response to Ms. Robb was:

> "**Craig [Altshuler] told me that** *you girls – sorry, ladies* **– get so worked up over this. ….**"

14

**"Jeez, I'm scared to say anything to one of you because I think
you might burst into tears…."**

**"You *gals* are so sensitive."**

81.     Despite Ms. Robb's complaints to Brown, as well as to her supervisor Altshuler,
nothing was done to remediate the situation.  To the contrary, Advent leaders' failure to act
encouraged male employees to look the other way.  By way of example only, in mid-November
2016, upon information and belief,  Ms. Kunert asked Tony Huang ("Huang"), a senior research
analyst, for his advice on how she could manage in this sexually hostile work environment and,
specifically, Brown's overtly sexist remarks, his degradation of women and others' participation
in similar behavior.  Huang's response to this plea for help, as well as his communications about
what Ms. Kunert said to him will be uncovered in discovery.

**VI.    <u>Male Employees Continuously Refer to Woman as "Bitches" and "Cunts"</u>**

82.     Shockingly, male employees at Advent commonly and openly used the words
"**bitch**" and "**cunt**" to describe or reference women.  Senior management did nothing to stop the
frequent use of such sexist and hateful terms, even when women employees shared their
concerns.

83.     In early 2017, Ms. Robb, Ms. Kunert and Ms. Kosiw began wearing headphones
in order to drown out the rampant misogynistic rhetoric on the trading floor.

84.     Soon after, Altshuler called Ms. Robb, Ms. Kunert and Ms. Kosiw into a room
and said that at Maitland's request, the three women must stop wearing their headphones.
Allegedly, Maitland apparently said that wearing headphones was not aesthetically
"professional" and that doing so would impede the women's ability to hear their phones ringing.

85.     Ms. Robb asked Altshuler whether it was "professional" to swear on the trading
floor or to use the words "bitch and cunt."

86.     Ms. Kunert asked Altshuler why the three female employees were being told not to wear headphones when male employees at Advent continued to wear headphones. Refusing to take any accountability, Altshuler said that he "is not in charge" of those male employees.

87.     Thereafter, male employees in the Fishbowl continued to wear headphones when they wanted to, but the female employees were prohibited from so doing.[7]

88.     Unsurprisingly, throughout 2017, a number of female employees left Advent, including Ms. Cross, Ms. Kunert, Ms. Dunleavy, Livia Shack and Gillian Patrick.

**VII.    Ms. Robb Issues Protected Complaints Regarding the Pervasive Sexual Harassment and Gender Discrimination to Which She and Other Women Were Subjected**

89.     On March 21, 2017, on the trading floor for everyone to hear, Brown said the following about Ms. Cross and her boyfriend:

> **"If I knew I could look like that and have sex with someone who looked like her, I would never go to the gym.  She's model hot.  I'd like a photo of her.  I can't believe she has sex with someone like him.  He must be really rich."**

90.     Ms. Cross and others heard this horrifying comment.

91.     The next day, on March 22, 2017, Ms. Robb learned that Ms. Cross had a panic attack on her way to work.

92.     With no Human Resources department, Haber purported to look into what Brown said about Ms. Cross and her boyfriend.

93.     Haber never intended to look into anything, however, because he failed to even ask Ms. Robb or the other female employees with knowledge about what happened regarding Ms. Cross.  Therefore, Ms. Robb requested that Haber meet with them to discuss the incident.[8]

---

[7]     The rampant sexist environment did not go unnoticed by all male employees at Advent. On February 23, 2017, at least one male colleague texted her, apologizing for Brown's behavior towards women and sympathizing with Advent's female employees, including Ms. Robb.  He expressed disbelief in his female colleagues' ability to withstand such constant hostility.

94.     On March 27, 2017, Haber met with Ms. Robb, Ms. Kunert and Ms. Kosiw.  Each woman corroborated Ms. Cross's complaint and the details of the incident with Brown.

95.     Ms. Robb further complained to Haber about the men's constant use of terms like "cunt" and "bitch" on the trading floor.

96.     All three women also told Haber about the "ranking" of women's attractiveness.

97.     Additionally, Ms. Robb told Haber about Advent's failure to provide a safe and clean pumping room for a colleague returning to work after having taken maternity leave.  This female employee had to resort to using shared restrooms in order to pump breastmilk – there was no designated pumping space.

98.     A mere **five minutes** after this meeting concluded, Ms. Robb was called into Maitland's office to discuss what she had just told Haber.

99.     Maitland's opening line to Ms. Robb when she walked into his office and made sure the door was closed, was, "**so, I heard you think the company's management is <u>fucked up</u>**."

100.    Ms. Robb denied making that statement but told Maitland that the environment at Advent was very challenging for women.

101.    In a misguided attempt to convince Ms. Robb of her unreasonableness, Maitland dismissed her concerns regarding her male colleague's language as "**locker-room talk**."  He also told her that she was "**making some things into a bigger deal than they needed to be**."

102.    Ms. Robb reiterated the challenges that women faced at Advent as evidenced by the disproportional rate at which female employees were leaving the company.

---

[8]     Ms. Robb requested this meeting via an email sent to Haber's assistant, Deanne Kubas.

103.    Incredibly, Maitland responded:

**"What do you want me to do?  Hire more women?  They just end up leaving to take care of kids!"[9]**

104.    Marginalizing and minimizing Ms. Robb's complaints, Maitland asked Ms. Robb if she "actually" had been sexually harassed by Brown.

105.    Ms. Robb told Maitland about the specific incident in the kitchen when Brown physically and inappropriately touched her and asked if she wanted a kiss.  Disgustingly, such unlawful treatment of a female employee by a "talented" senior male portfolio manager did not seem like "actual sexual harassment" to Maitland that warranted any action other than <u>penalizing Ms. Robb for daring to report it.</u>

106.    Three days after her first meeting with Haber, on or around March 30, 2017, Ms. Robb was brought into Haber's office alone and aggressively questioned behind closed doors about other instances of Brown's sexual harassment and discriminatory conduct.

107.    Ms. Robb told Haber that Brown frequently defended and justified his actions and language, often blaming his female colleagues for issues or errors that arose on the trading floor. Ms. Robb informed Haber that Brown had once said:

**"You *girls* just don't know how a trading floor operates. Everything happens quickly and we don't have time to think. You've got to get a trade done instantly and strike at the right price.  So, you can't be sensitive to what is said on the trading floor!"**

108.    Because Advent and Maitland valued the money that Brown made for the firm, he was allowed to engage openly in such outrageous unlawful commentary.

---

[9]    Once Ms. Robb's meeting with Maitland had concluded, Maitland essentially held the same conversation with Ms. Kosiw in another private meeting.  Ms. Kosiw later told Ms. Robb that Maitland repeated this same comment to her in this meeting.

109.   Haber then unexpectedly directed the conversation towards rumors of Brown's salacious hobbies.   Specifically, Haber asked Robb if she was aware of or had heard anything about Brown's alleged:

- Photo shoots with female models on his property or at his residence;
- Naked photo shoots with women on his property or at his residence; or
- Photography of naked women at his residence.

110.   At the time, Ms. Robb had not heard about these disturbing practices but after this meeting, Ms. Robb understood that rumors had been circulating regarding Brown's naked photography collection and hobby.   She learned that Advent employees openly joked and discussed that Brown used such photos to create lewd calendars that he then distributed to certain Advent employees.

111.   On March 31, 2017, Ms. Robb sent an email to Haber that included other sexually-charged and inappropriate comments Brown had made in the work place, including but not limited to those described in this Complaint.  Ms. Robb wrote:

> "Kris,
>
> Per your request for details regarding our discussion yesterday, as it related to Mike Brown, I am providing the following chronology to the best of my recollection [sic]:
>
> - The week of August 22, [2016], Mike Brown said, watching women get out of cabs in short skirts should be a spectator sport. This comment was made on the trading floor.
> - On September 12, [2016], Mike Brown asked how my weekend was and if I had a wild weekend. He told me I look like a party girl. This conversation took place in the kitchen.
> - On October 10, [2016], Mike Brown said I hate the fall when women stop wearing those short little skirts [sic]. He commented that he should have been a cheerleader in

19

> college so he could spend his time looking up girls' skirts. These comments were made on the trading floor.
>
> - On November 22, [2016], Mike Brown said that on her best day Chelsea Clinton is a "3." This comment was made on the trading floor.
> - On December 20, [2016] Mike Brown made those comments about me that we discussed (I'm an idiot/zero reading comprehension skills/etc.) [sic]. These comments were made on the trading floor. I addressed it with him directly in the conference room by Tracy [Maitland]'s office the same day around 5pm [sic]. I spoke to Craig [Altshuler] afterwards.
> - On January 9 or 10, [2017] there was a long discussion ranking women's appearance on a 1-10 scale. I consistently heard Mike Brown assign numbers to numerous unknown women. (ex: She's a 7 in most places, in New York she would be a 6. She's an 8/8.5, and so on and so forth) [sic]. This discussion took place on the trading floor."

## VIII.   Advent's Discriminatory Practices against Female Employees Included Conduct that Impacted Compensation

112.    At Advent, the male-centric leadership contributed to and fostered the rampant sexually motivated gender bias and conduct set forth above, as well as helped to develop systemic gender based discrimination that disparately impacted female employees and caused female employees to receive less benefits, promotions, opportunities and compensation, as compared to male employees.

113.    Too many examples exist that show how Ms. Robb and her female peers were disadvantaged at Advent simply because of their gender.  However, discriminatory employment practices influenced the decisions about base pay, bonuses, titles, advancement and evaluations of performance.

114.    Specifically, such decisions were made on a subjective, discretionary basis that were not controlled by any objective metrics.  Such systemic failures allowed male managers to

perpetuate gender discrimination that caused Ms. Robb and similarly situated female employees at Advent to experience the following:

- Unequal base salary for substantially the same work as compared to men;
- Unequal bonuses for substantially the same work as compared to men;
- Unequal benefits and other forms of compensation as compared to men;
- Unequal opportunities for advancement as compared to men;
- Unequal opportunities for development as compared to men; and
- Unequal performance evaluations as compared to men.

115.    At Advent, only those in leadership positions (all men) had the authority to make meaningful client contacts and forge new client relationships.  Numerous opportunities to attend out of office conferences, dinners, drinks, social events and golf outings were provided to the men, but not to Ms. Robb or the other female employees.

116.    These outings provided opportunities to develop advantageous work relationships that influenced treatment in the workplace, including whether employees were recommended for new accounts, bigger clients, promotions and increased pay.  By way of example only, Kane and Altshuler were allowed to travel to conferences, go on golf outings with clients or with industry peers, and take clients out to dinner. They were given corporate credit cards and access to other social events that were offered in part due to Maitland's connections and business relationships.

117.    Denial of these opportunities ensured no upward movement for Ms. Robb and the other women in the CAG.

118.    Additionally, Kane and Altshuler managed and led the monthly reporting calls with clients.  Ms. Robb, Ms. Kunert, Ms. Kosiw and Ms. Dunleavy were required to prepare the

materials for these client calls, draft the write-ups and performance analysis and organize the scheduling for the calls.

119.    Altshuler required Ms. Robb to be present on these client calls but instructed her that she was "not allowed" to speak.

120.    During many of these client calls, Altshuler read directly from Ms. Robb's prepared notes and drafts regarding performance analysis for the clients.

## IX.    Female Employees at Advent Are Expected to "Clean" and "Schedule" for Their Male Counterparts

121.    As further evidence of "less than" treatment, the men at Advent regularly expected female employees, including Ms. Robb, Ms. Kunert and Ms. Kosiw, to engage in administrative tasks such as cleaning the office or scheduling appointments for the men. Similarly situated male employees were never asked to perform such tasks.

122.    By way of example only, female employees, regardless of their position, were expected to clean the conference rooms after meetings, including after coffee or food. Specifically, Altshuler asked Ms. Robb on several occasions to clean up in the boardroom after breakfast, lunch and/or coffee was enjoyed by male colleagues.

123.    Further, Altshuler regularly asked Ms. Robb to schedule his lunches and dinners as well as make his restaurant reservations. Altshuler did not ask similarly situated male employees to do such things for him.

124.    On April 27, 2017, Advent's Chief Financial Officer, Robert White ("White"), insisted via email that Ms. Robb clean out Ms. Cross's desk after Ms. Cross resigned.

125.    When Ms. Robb objected and said that this task should be handled by the male office manager, Bertino Correa ("Correa"), White insultingly requested that Ms. Kosiw, take charge of the task instead.

126.    A meeting was held shortly thereafter, in which the employees were lectured on the importance of being "team-players."

## X.    Advent Retaliates Against Ms. Robb For Complaining

127.    In the days immediately following this series of meetings with Maitland and Haber, Ms. Robb noticed a material change in management's demeanor toward her.

128.    By way of example, as Ms. Robb's direct supervisor, Altshuler began to insist that he review all of Ms. Robb's work prior to it being sent out.  He had never micromanaged Ms. Robb in this way before her complaints to Maitland and Haber.

129.    Indeed, Altshuler did not treat other male employees in a similar manner; his campaign of micromanagement was directed at Ms. Robb only.

130.    In or around early April 2017, Altshuler berated Ms. Robb for not adhering to his formatting preference on a standard internal report to be submitted to Haber.  He ridiculed and insulted her work in front of all the employees on the trading floor.  Ms. Robb was mortified.

131.    In the meantime, Brown continued operating as he had been throughout his entire career at Advent, relentlessly harassing Ms. Robb and other Advent women.

132.    Worse, the only semblance of discipline Brown received for his harassment of Ms. Cross was that he had to move his desk away from the center of the trading floor.

133.    Brown's offensive remarks and declarations continued to be heard by all on the trading floor.

134.    In mid-April 2017, one of Advent's traders, Billy Stewart ("Stewart"), horrifically told Ms. Robb that a recent "**fuck, marry or kil**l" discussion involved her and whether her ranking should change from her existing "**marry**" status to "**kill**" status.  The men involved in

this specific "**fuck, marry or kill**" conversation included, but were not limited to, portfolio managers and traders Mike Friezo, Doug Teresko, Stewart and Brown.

135.    Stewart also relayed to Ms. Robb that during this conversation, Brown had referred to Ms. Robb as an "**uptight bitch**" who was already at "**wife**" status.

136.    Painfully aware that her prior complaints had done nothing but enhance the hostility she was routinely subject to, Ms. Robb did not report this incident to anyone.

137.    On April 27, 2017, Ms. Cross resigned from Advent.

138.    After Ms. Cross left, Brown immediately returned to his original desk. As evident, management's decision to remove Brown from his desk was in an attempt to appease Ms. Cross and not made with any genuine intention of discipline him for his egregious behavior or acknowledging the impact his conduct had on the female employees.

## XI.    Ms. Robb is Terminated as a Result of her Protected Complaints

139.    On May 10, 2017, Haber praised Ms. Robb for her work with a prospective client, Memorial Hermann, in an email to the entire firm.

140.    On May 22, 2017, Ms. Robb spoke with Haber about Altshuler's recent campaign of micromanagement towards her.  Ms. Robb explained to Haber that she could not understand Altshuler's marked shift in attitude toward her and her work.

141.    On May 23, 2017, one day after this conversation with Haber, and less than two weeks after Haber had openly acknowledged Ms. Robb's success on the Memorial Hermann project, Haber announced that Advent had indeed won this account.

142.    Tellingly, Haber failed to acknowledge Robb's vital contributions to the project in the celebratory email he circulated to the firm that day.

143.    Ms. Robb immediately requested another meeting with Haber and told Haber that she felt she was being retaliated against in response to her complaints about Brown.

144.    One day later, on May 24, 2017, Advent terminated Ms. Robb.

145.    When they fired her, Haber and Altshuler told Ms. Robb that she was being let go because she was a "**poor company fit**."  Further harming Ms. Robb, Altshuler later told Ms. Robb's former colleagues at Advent that Ms. Robb had "hindered" the Memorial Hermann project's success and that he had been forced to take over her work.

**XII.    Advent Files a Punitive, Retaliatory and Unlawful Civil Action Against Ms. Robb**

146.    On or about June 19, 2017, Ms. Robb's counsel informed Advent of her intent to pursue legal action for her claims of gender discrimination and retaliation, and thereafter even sent a draft EEOC charge detailing her legal claims.

147.    In July 2017, Advent responded to the notice of her legal claims by engaging in additional, further acts of retaliation. In blatant, textbook retaliation, Advent attempted to silence and prevent her from seeking to vindicate her rights under anti-harassment and discrimination laws by issuing numerous threats, including inter alia:

> **"…you should be aware that Advent is preparing a complaint against Ms. Robb for theft of corporate property and numerous breaches of her contractual and fiduciary obligations as an Advent employee."**

148.    On December 15, 2017, Advent doubled-down on its retaliation and commenced an action against Ms. Robb in New York State Supreme Court.

149.    Among the false and defamatory accusations contained in the New York State Action are the following:

- Ms. Robb engaged in "**illegal**, unauthorized and otherwise wrongful misappropriate and **theft** of confidential information."

25

- Ms. Robb "**stole key documents from the company**."
- Ms. Robb "**harmed Advent's business** to benefit herself and Advent's competitors."
- Ms. Robb is liable for "misappropriation of trade secrets, breach of fiduciary duty and loyalty and conversion and **civil theft**."

150.    Advent filed this action for the sole purpose of stifling Ms. Robb's legitimate claims, to harm her personal and professional reputation causing her further harm, and to send a message to Advent's current and future female employees that this is what happens to women at Advent who speak out about discrimination.

151.    The NYS Action composed of baseless falsehoods is textbook retaliation against an employee for engaging in protected activity.  In fact, this employer-initiated litigation was not motivated just partially by a retaliatory animus, but fully by a retaliatory animus.

152.    The temporal proximity standing alone shows the unlawful animus.  Coupled with the failed attempts to dissuade Ms. Robb not to "follow through" with an agency charge against Advent, retaliatory intent is clear.

153.    Even though Advent already had unlawfully terminated her at the time it filed the malicious NYS Action, under New York law, the act of filing such a complaint constitutes an "adverse action."

154.    As Advent knew at the time it opted to retaliate, Ms. Robb only had emails and documents on her laptop because Advent made her do so in order to work after hours and on weekends.  As set forth above, Advent made Ms. Robb bring in her personal laptop (not a company issued laptop) so that IT could add software to facilitate after hours work.

155.    It is incredulous for Advent to claim that Ms. Robb had documents for any improper purpose.  Moreover, as Advent knew, it had, and continues to have, each and every email Ms. Robb had on her laptop relating to business at Advent.  Indeed, the Advent's IT

employees possessed full access to her email accounts and related Advent software installed on her laptop.

156.    Among the litany of horrific damage that Advent has inflicted on Ms. Robb through the course of the NYS Action, too many to set forth in this Complaint, was Advent's insistence that Ms. Robb pay $20,000 to have her personal laptop "wiped" of an Advent emails.

157.    Had Advent paid the approximate sum of $1000 to issue its own company owned laptop to Ms. Robb, she simply could have turned the laptop over at the moment Advent fired her and Advent would be in possession of whatever it believed it was entitled to possess.

158.    Advent's own miserly practices forced Ms. Robb to use her personal laptop for Advent's after hours work.

159.    Disgustingly, Advent believes that Ms. Robb must be denied the ability to offer work emails that demonstrate the discrimination and sexual harassment she experienced, as well as show that she complained during her employment.

160.    There is no work around the anti-discrimination laws as Advent wishes.

161.    In textbook fashion, Advent has blamed, shamed and victimized Ms. Robb over and over again.  For more than two and a half years, Advent has engaged in abusive, retaliatory litigation that has exceeded all boundaries of civility.

## FIRST CAUSE OF ACTION
### (Gender Discrimination in Violation of Title VII)
### *Against Defendant Advent*

162.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

163.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of Title VII by subjecting her to disparate

treatment based upon her gender, including, but not limited to, denying her equal terms and conditions of her employment.

164.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

165.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer monetary loss, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

166.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII for which Plaintiff is entitled to an award of punitive damages.

<u>**SECOND CAUSE OF ACTION**</u>
**(Retaliation in Violation of Title VII)**
***Against Defendant Advent***

167.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

168.    By the actions described above, among others, Defendants violated Title VII in that they unlawfully retaliated against Plaintiff for her engagement in protected activity and her opposition to Defendants' unlawful conduct in violation of Title VII, including by terminating her employment, filing a retaliatory, punitive and baseless lawsuit against her, and engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected complaints.

28

169.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

170.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer monetary loss, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

171.   Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Gender Discrimination in Violation of NYCHRL)**
***Against All Defendants***

172.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

173.   Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying her the opportunity to work in an employment setting free of unlawful discrimination and sexual harassment.

174.   Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by, *inter alia*, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

175.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

176.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

177.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

178.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

179.    By the actions described above, among others, Defendants violated the NYCHRL in that they unlawfully retaliated against Plaintiff for her engagement in protected activity and her opposition to Defendants' unlawful conduct, including by terminating her employment, filing a retaliatory, punitive and baseless lawsuit against her, and engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected complaints.

180.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

181.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

182.     Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
### *Against Defendant Maitland*

183.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

184.     Defendant Maitland knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYCHRL.

185.     As a direct and proximate result of the unlawful conduct of Defendant Maitland in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

186.     As a direct and proximate result of the unlawful conduct of Defendant Maitland in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

31

187.    The unlawful actions of Defendant Maitland were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

188.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

189.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL, including, but not limited to, by terminating Plaintiff's employment.

190.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages.

191.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which she is entitled to an award of compensatory damages and other relief.

192.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against All Defendants*

193.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

194.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including but not limited to, by terminating Plaintiff's employment.

195.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages.

196.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

197.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
#### *Against Defendant Maitland*

198.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

199.    Defendant Maitland knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

200.    As a direct and proximate result of the unlawful conduct of Defendant Maitland in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

201.    As a direct and proximate result of the unlawful conduct of Defendant Maitland, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

202.    Plaintiff is further entitled to an award of punitive damages as Defendant Maitland's unlawful conduct was and remains reckless, wanton and/or malicious.

**NINTH CAUSE OF ACTION**
**(Violations of the Equal Pay Act)**
***Against All Defendants***

203.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

204.    During the period of Plaintiff's employment with Defendants, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. §§ 206 *et seq*.  During that time, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

205.    Defendants engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or

substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

206.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. §206 *et seq*.

207.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

208.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

**TENTH CAUSE OF ACTION**
**(Violations of New York Labor Law Equal Pay Law)**
***Against all Defendants***

209.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

210.    During the period of Plaintiff's employment with Defendants, Defendants were subject to the provisions of the New York Equal Pay Law, N.Y. Labor Law § 194.  During that time, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff and at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than gender, such as education, training or experience.

211.    Defendants engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser

rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions and at the same establishment.

212.    By the actions described above, among others, Defendants have violated the New York Equal Pay Law.

213.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Equal Pay Law, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

214.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York and the City of New York;

B.    An order that Defendants engage in injunctive measures aimed at remedying the unlawful conduct described herein so that other employees will not be subject to the same unlawful conduct;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

E.     An award of punitive damages in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     An award of Plaintiff's reasonable attorneys' fees and costs; and

H.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 18, 2020
       New York, New York

                                   Respectfully submitted,

                                   **WIGDOR LLP**

                                   By: _____
                                        Jeanne M. Christensen

                                   85 Fifth Avenue
                                   New York, NY 10003
                                   Telephone: (212) 257-6800
                                   Facsimile: (212) 257-6845
                                   jchristensen@wigdorlaw.com

                                   *Attorneys for Plaintiff*